This geofence warrant was unconstitutional for three main reasons, each of which puts the your data, your property, like your emails, your photos, your documents, all stored as private content in your Google account. Probable cause is required to search it. But the police did not have probable cause to search Mr. Chatrie's location history data. But you know, just to be clear in terms of the technology here, the district court here, I would say probably, I don't know of another case that's done as fine of a job laying out what it is. It's a concept that's not familiar to most of us, even if you are technologically savvy. But how here, if you will, just synopsize, just very briefly, I'm asking, I'm trying to impose on my colleagues time here, but I think it's important for us to know what a geofence warrant is. Certainly, your honor, a geofence warrant searches the location history data of everybody who has location history. Who does the actual searching? Google is searching at the command of the government. They are being commandeered by the government to conduct this search. This is not the normal search where you get a warrant to search a house and the officers are searching it. This is a warrant to ask Google to do a search. Is that right? That's correct, your honor. They are commandeering Google to search through this data called location history data. What controls how Google conducts this search? I mean, they have the distance here, as I understand, was it 17 miles? What was the location? About 17 and a half acres, your honor, but it's a radius of 150 meters. So what does Google search? Is it every phone there, information, or is it a particular group? How do we know what it's searching? So about a third of all Google users have location history enabled. Google in this case said it was numerous tens of millions. We now know it's closer to about 592 million people. Every time a geofence warrant is run, it forces Google to look at the location history data belonging to each one of those users to see if there's a match. And that's everybody's, would that be like the phones of, let's say, sit in this courtroom or in our office, the judges here, all those are part of this warrant. Is that right? That's correct, your honor. Everybody, whether you're in a building or whether you're on the street, everybody's phone is part of that Google search, that initial search, that step one, I guess. That is absolutely correct. And statistically speaking. Well, that's not actually correct, right? Because it's only those that have opted into the location services, right? It's, as you said, only those who have enabled Google location. It gets a little bit tricky because there are actually three different types of location data that Google collects. We're talking about one specific. But the type you're talking about, what was searched, right? You said it's about a third of the users, right? So those are the ones that have enabled it. Two thirds have not enabled it, have rejected it. So when Judge Wynn says it's everybody's phone, it's only those phones that enabled it. Correct. It is. Right. And so if my phone has not enabled it, if I didn't opt into the service or after I opt it out of the service, it would not be searching my data. If you never opted in, then you're correct. If you opted in and didn't delete your data before you turned it off, then you would still pretend. Excuse me. The default position is that you haven't opted, you know, that you're not in. If the default position was that you were in unless you opted out, that would be one thing. But the default position is that you're out unless you opted in. And the fact that you have to take an active step to opt in, that cuts against you, doesn't it? I think it actually reinforces our argument that this is... Okay. Tell me how. Sorry? Tell me how that reinforces your argument. Because it further indicates that this is user data. It is their property. So just like their emails, photos, documents, everything else that's stored in a Google account, location history is user-generated content in the same way. You don't have to choose to write emails, but if you do... How does this differ, essentially, from a checkpoint where, you know, a law enforcement collects information or asks for identification and what have you from people who are manifestly innocent? Their only situation is that they happen to be in the vicinity. And that argument was posed at the fact that they said, oh, the checkpoint is a drag net. It's taking in perfectly innocent people. And there's a fair argument. But the Supreme Court didn't accept it. They said, no, the checkpoint is necessary to do this. So, I can see some ways in which to distinguish it, but on the basic principle that it is not per se impermissible under the Fourth Amendment to investigate a little bit on the basis of vicinity, which this is doing. It's investigating on the basis of vicinity, and the checkpoint decisions seem to involve something of the same principle. I understand Your Honor is speaking about the Lidster case, and I would draw a number of distinctions between that case and what happened here. First, there was a diminished expectation of privacy due to the automobile exception on the road, contrast with somebody's private papers and documents. Second, the search and the roadblock in Lidster was not conducted for general crime control purposes. They weren't attempting to identify any particular driver as the suspect in that hit and run. They were voluntarily asking for information and handing out flyers. But don't you, don't you, we've already brought up the point that you lose a certain expectation of privacy when you opt in, but I think the Supreme Court has said you also may lose a certain measure of privacy when you go out in public, and it is important to me this is not concern an arrest in a home. It did not concern surveillance of a backyard. It didn't concern surveillance of a home. Didn't, you know, involve police actions on the cartilage of a home. We were talking about public movements from one place to another, not just in the bank, but in the vicinity of the bank. There's a restaurant in the vicinity of the bank, and the locational data covers that. But when you move in public from place to place, in terms of the Fourth Amendment, don't you give up a certain measure of privacy that you, essentially, you know, the home is your castle, but the bank isn't your castle. And don't you give up a certain measure of privacy there? I think to some extent, yes, when you're in public, somebody can see you walking down the road or see you walking into a bank. But the Supreme Court has said a number of times now that the public space doctrine doesn't guide us when it comes to new technology, when it comes to digital data. It's not just in the public. It's in homes. It's in churches. It's everywhere you go. And it's not as anonymous as it seems because you can identify who it is. You can identify all kinds of information once you do this. This opt-in is a fiction because the opt-in, you can't even use Google Maps. You got to opt-in. You can't access your bank. You opt-in, so to speak. Once you opt-in, it doesn't just kick you back out when you finish using that application. It stays on your phone. So one-third clearly have it up there. I submit to you, nearly everybody that uses a phone is going to hit location at some point in time. The question is, do you then opt out? And so when you look at this, this is not one of those situations where you get to check a box. Okay, and the phone pops up in front of you. Most people have no clue right now if they look at their phone as to whether location services was on. I submit to anyone right now, look at it, unless you are consciously looking at it and says, is that on? You don't know it's on. And you don't have an idea that now there's a net that's been thrown out. And it doesn't just cover folks walking on the street in the public. I'm home on my own phone or anybody else's on their phone. They're in church. They are even in hospitals. They're everywhere. And it is collecting data. Google is collecting. And this other fiction that, well, it's only, Google is only going to, those who opt-in to search of it and can only get those who've done it. The technology that Google has exists, you don't need location on for Google to be able to tell your location. We've had those cases, the cell phone case tiles tells you that you don't need to actually do it. They actually have the technology to be able to find what's there if you go to that next step. We don't know what extent Google is conducting the searches or what it, because it's Google doing it. And if we want to give up every right and say, why don't we just say everybody, why have a warrant? Why don't you say, you can just do it, period. If you don't need a warrant, because there's no particularity, there's no one specific. So why have a warrant? Why not just tell the police, well, just do it anyway. Google sent every information of every individual on planet Earth to the police department. And you don't need to waste time doing a warrant, because what you just described, there's nothing particular. There's no specificity that meets it. You don't even acknowledge that there's a case called Carpenter that has some applicability here. So we go there with this. I think we just opened up the universe. I don't know any court that's done it, has it? No circuit court, Your Honor, has blessed a geofence. Not that I know of. But I don't know, has it ever been confronted with the issue? This is the first circuit court that is confronted with the issue. So now we're confronted with a situation with the end result, in my opinion, would be, you don't need a warrant. Because if we say this, you can qualify that by simply looking at folks. You can see if they got guns. You can see if they got this or whatever. We're going to throw a geofence warrant out. And everybody in Richmond, everybody in Charlottesville, everybody in Raleigh is going to be under this warrant. And I don't care if you're home in a Christmas party, your phone, which you have no clue as to whether the location is on or not, because you just use it as GPS to get back. And boom, it's on the phone. And so therefore, every bit of your information is now out there in the policing. That's a warrant. I don't get it. There's nothing that I know in the Fourth Amendment ever has fit anything like this. So I might suggest that there is particularity, because you have to judge particularity in light of the circumstances of the investigation. And here, the particularity lies in the crime. It lies in the place that the crime was committed. It lies in the fact that the area, while it's not immediately centered on the bank, is at least circumscribed. That is the particularity that adheres in this kind of situation. I guess a larger point is you have people who are criminal offenders who are using all kinds of sophisticated technological techniques to evade law enforcement. And the question I have is, you're going to create an imbalance in the ability of the offenders to use the very latest technological, the very latest techniques to evade law enforcement. But law enforcement cannot use and adapt its technology or Google's technology to the differing situations that it confronts. And if we reverse this question, we would almost be saying, as a per se rule, that geofence warrants were impermissible. And this was a bank robbery here, and you know, there may be some people that say, well, bank robberies are very bad and they're serious, but they're not that serious. What happens when you get someone with a nuclear device or someone in possession of a biological agent or a chemical agent in a city? They say, oh, well, four circuits says these geofence warrants are impermissible. And your response to me would be, oh, well, you can avail yourself of the emergency doctrine. And the emergency doctrine is an exception to the warrant clause. We don't need to jump through these hoops if we are dealing with an emergency, to which my response to you would be, it would be nice with a geofence warrant if it could be helpful, as this one obviously was helpful, to cut off these kinds of very nefarious enterprises at the very outset before they reach the emergency stage and law enforcement has to resort to the emergency exception to the warrant clause. And so what I'm doing and what I'm concerned about is that we could be prescribing a very valuable tool in the hands of law enforcement in very serious situations for which we would all, all kinds of people would pay a devastating price. So, your honor, I recognize I'm out of time. No, no, I want, this is important and it's important to get your view of it. I'd like to be very, very clear on this point. Our position is not that law enforcement cannot search location history data. Of course law enforcement can search location history data or any other Google data that they would like to search, provided that they establish probable cause to search it and identify the data that they would like to search. And the problem here is that neither of those two things happened. This warrant was profoundly unparticularized. The police had no idea whose or how many individuals data would be seen. The particularity of it is the over breath of it. Even if you can find this particularity, the court has made it clear, that's two different, you don't call that particularity with over breath in it. And the scope of this thing is unreal. I absolutely agree with you, your honor, that there was absolutely no probable cause to justify the search. It was based on nothing more than a series of statistics that could apply in any case. You say that the only probable cause, that it must relate to the identification of a particular suspect. And historically I think that's been true, but probable cause is addressed, as I think the Supreme Court has made clear. And the question is, is it reasonable to believe that probable cause exists, that the geofence warrant would assist materially in the investigation? And you don't have to, and it is almost impossible to identify a suspect for a particular bank robbery in advance. But what the geofence warrant helps you do, is it aids in the investigation. And if it does that, I'm not sure why it wouldn't relate, why that wouldn't be probable cause. I think, your honor, for the same reason, if there's a stolen painting and you know that the robber is likely in that big apartment building, you still can't go in and search every apartment. You have to identify which unit you plan to go and search. In other words, you know that it will help you, just like if you were to draw a complete line and cordon off a whole city, you can go by and search everybody in there, you're going to find it. If you get an opportunity to search every individual out there within a particular radius, the same level of particularity, the same level of over-breathness is in here. You can just do it, just go in and just search the whole area, and this business about trying to get the criminals, do lawful citizens have to give up their rights in your pursuit to what extent to get criminals? Because if you want to do that, you can do what Nazi Germany did, you can simply just go in every house and knock down the door and see if it's in there, if it's not in there, okay it's not in, you're not a criminal, you're good. And that's where we're going with this, eventually we're getting to where technology is now going beyond what you can do on foot. You are now literally not being on feet with the same thing, walking in there, grabbing everybody's phone, saying let me see your phone, and looking at everything on that phone, you're okay, you're okay, you're okay. And at the end of the day, there's no privacy at all, why not just do it all the time? But I submit to you, contrary to my friend, Judge Wilkinson, we don't have to say that geofence warrants cannot be used in a way, what we have to say is that they need to be kept in a way in which you do incorporate the principles of particularity over-breath, in which you do have more than just a broad over-breath search of a place. I mean, and that can happen, and if you have a nuclear situation, you're going to lose a lot more rights than the 4th Amendment as citizens around here. That may be a good example for something, but if there's someone with a nuclear bomb here, there's going to be a lot of rights lost by everybody in this area here, and it's not just going to be the 4th Amendment, because that's a whole national security, national emergency exception that you just can't avoid. So you can use the extreme example, you could have used it in the Carpenter case, the same kind of thing, but if you've got someone carrying a nuclear bomb around in a car, you know, the same thing. And the Supreme Court took its action in the manner that it did because it realizes the 4th Amendment has to have some limitations in this increasing world of technology, because it's going to get more. It's as much as when you could use heat lamps, heat-seeking type equipment to look to see if there's heat lamps in the house and that sort of stuff. The court has recognized there's got to be some limit on this technology, because there is no privacy, and if we are going to allow this information used by the police, no individual around here, I don't care if you've got a phone, I don't care whatever you have, has any privacy whatsoever. Unless, of course, they choose not to op-in, and that's, they can preserve their privacy with a simple, simple step, but quite apart from that, my friend, Judge Wynn, said that this is all so new and it's a brave new world of technology, and all the rest, but the Supreme Court has taken care to limit this and to ground it in a very traditional basis, and the traditional basis is, in Carpenter, they said locational data for seven days, that's way too much. All right, this is as we recognize locational data for two hours, and why was there that difference between seven days and two hours? Because the two hours was thought to be consistent with traditional police surveillance capabilities, that a police can supervise or tail somebody for two hours, they couldn't do that for seven days. So, this is, it seems to me, very important to recognize what the Supreme Court is doing here, which is to look at it in terms of what traditional police surveillance techniques were available, and two hours versus seven days links up with traditional police enforcement capabilities. But, you know, I wish every bit as much as you genuinely do, that we lived in a world of perfect security and perfect privacy. We're not, we're not going to have both. It's not going to be perfect. That doesn't mean that you give up all your privacy rights, and it doesn't mean that we can do anything in the name of national security. It involves a certain amount of compromise, and I don't know how this FBI agent, Officer Hilton, is expected in a question that vigorously divides us both, and probably the good people who are listening, about whether this is valid or not. How is an FBI agent supposed to know when applying for a geofence warrant that whether the law is, whether the two hours versus the seven days in Carpenter makes a difference, or whether the third party doctrine in Smith and Miller, whereby you use information disclosed to a third party and conveyed by them to government authorities. Has that been overruled? So we've got serious questions here about the timing of localities, the timing of the locational data, the length of the locational data, the status of the third party doctrine and everything. And we're trying to turn this FBI agent into a lawyer that we even can't agree on. What justification is there for doing that? So I want to respond to your Honor's question initially about Carpenter, but I'll take the second one first. So geofence warrants may be novel to this court. They're not novel to law enforcement. The first one was in 2016, and Google now says they're about a quarter of all search warrants they receive. But general warrants, warrants that are devoid of probable cause and particularity, like this one, have always been unconstitutional. This is, in our view, a modern-day general warrant, and that would have been apparent. There are no case-specific facts to establish probable cause. I mean, it sounds like it's so simple. Why in the world would you walk around with a phone and not just opt out of this? What about this opt-in? I mean, don't use Google Maps. Don't use the phone for what it is. Just opt in. And then once it's there, shoo there. I mean, that creates a black-and-white world that does not exist. There's no such thing as opting in. You can probably look at your phone now and see that you have it and don't know you have it. If you were to go around and do a survey and say, do you have it on, people wouldn't have a clue. Most of them would not. Some would. I do. I'd be willing to bet at least two of the three up here do. I don't know about you, Judge. I'm not certain whether you do or not. On this Carpenter case, and Judge Wilkins has articulated it in his view, but it was definitely limited to the facts. It used seven days because that's what it was before. Seven days. That's all. And then the court went on to make it clear in Carpenter. I mean, there's a lot of equability here, but you can parse it out and pick and choose facts and laws out of any case and make the case for what you want to. But the end result is this is not about that officer. All officers face difficult situations. All officers are in danger. We balance this. There's a right under the Constitution that's being dealt with here. And it's not just affecting the criminals. It's affecting everybody from the person in the church to the guy on the street to the one in the hospital to the one in their homes. And everybody might as well take their phone. When this warrant goes up, you can just look at his phone. That's literally what has happened. You look at his phone, see all my data in here. All right, I'm not going to go to the next one. That's what's happening. It's a blanket search. I agree with you. Can I ask a factual question that keeps coming up? Is there any evidence in the record that you cannot use Google Maps without opting in to this program? I think we should be clear about this because... The answer to that is no, right? Of course you can use Google Maps without opting in. You can use Google Maps without opting into location history. That is correct. However, I think it is important to take a step back here and go to the question... Let me ask you this. Do we know when a phone is sold to a person that location maps is off or is it on? I'm sorry, can you repeat that? Is location services on generally when a phone is sold or is it off? Location services is going to be different than what we're talking about here, which is location history. Is it on? It's not on. So you have to actually put location history up there. Yes, now how that happens is something of a mystery even in this case. And it is far from clear that Mr. Chaudhry knowingly and voluntarily activated location history. The consent flows are quite deceptive and easy to click on. But that said, I want to go back to this Carpenter point because I think it is very, very important to draw a distinction between the cell site location information in Carpenter and the location history data here. In Carpenter, you're talking about a company's business records. Here, you're talking about somebody's private data in their Google account. It would be as if the government said, hey, can we just search everyone's email for cocaine or write-off or whatever you want to put in there? It's the same principle. You're maybe identifying something specific that you would like to search, but you, in order to do it, have to go through everybody's private data. It belongs to them in a way that cell site data did not belong to Mr. Carpenter. But that said, the accuracy, the potency of location history is far greater than cell site data. Seven days was all it took in Carpenter. That was what was on the fax before the court. There was no period of time less than seven days. Thank you very much, Counsel. We have some rebuttal time as well. We look forward to hearing from you then, okay? Thank you, Your Honor. Mr. Kupfer, let's hear your side of it. May it please the Court, I'm Nathan Judish on behalf of the United States. In our brief, we set forth three bases for this court to affirm the district court's denial of the suppression motion. I'd like to start by talking about the warrant because the warrant here complies with the Fourth Amendment. Can you start with standing instead? Because we spent a fair bit of the time here talking about whether standing existed. And we look at Carpenter and beautiful struggle. We come up with two different ideas that, like, in order to have standing, it's got to be an extended period of time, which we lack here. But also from Carpenter, the third-party doctrine applies unless it is both indispensable and involuntary, right? And we have neither indispensability, not sure that's a word, or involuntariness here. So why would there be standing at all given the third-party doctrine as Carpenter applies it? That's right, Your Honor. Both lines of cases, cases involving location and movement and cases involving information disclosed to others, those are what Carpenter looked at. And both of those here point towards no reasonable expectation of privacy. Regarding the information and movement issue, in this case, or this court, in the leaders of beautiful struggle case, it said that Carpenter does distinguish between long-term comprehensive location information and short-term location information of the sort that would have been traditionally available in the pre-digital age. And what we have here, the information we got, is merely two hours of the defendant's location information during which he traveled on public roads, robbed a bank, and then returned. And we have testimony from Agent Derrico that it wasn't even sufficient to determine what house he lived in. Further investigation was required for that. So really, this is just information of the sort, which would be traditionally determined by, say, video camera surveillance of the area of the bank. And in your view, those are alternative grounds on which to reach the Fourth Amendment standing issue. Either, A, under what we applied as the mosaic theory in beautiful struggle, there's insufficient length of data in order to develop patterns and habits, in which case you lack a reasonable expectation of privacy. That's ground one of no standing. And ground two of no standing is that, independent of that, if you voluntarily opt into a program that is not necessary to functioning in life, right, which are the two pieces of Carpenter, then the third-party doctrine applies, and you lack standing on that ground. That's right, Your Honor. Those are two independent grounds, and we could prevail on either of them. We prevail on both. And only if we rejected your argument on both of those grounds would we get to, and I want you to get to it, this secondary question about, is the warrants, probable cause, and particularity sufficient? And only if we reject that do we get to the third line of arguments, which I assume you're going to tell us is good faith. Yes, that's right, Your Honor. And though, I mean, that's sort of the logical way to reason through it, but this court can rule on any of those grounds it wants to. It isn't required to determine any of them. It could rule only on faith. It's not a steel-co aspect to Fourth Amendment standing. It's a logical way to think through the issues in this case, in the sequential way. And then, so regarding the voluntary disclosure, you know, I would think there are two things here. This court is already focused on the fact that there's this indisputable and opt-in system. Google does not store your location history unless it first presents to you certain specific language that it calls its consent flow that tells you, say, is where you go with your devices, that it will use that location information to provide you services and directs you to online where you can see or delete that data. And you must click, you know, yes, I'm in or turn on. So you're saying Google cannot store your location history if you do not opt-in? That's absolutely right. Technologically, you believe Google cannot store your location history even with location services off? Location history. I'm saying Google. I'm not talking about anybody else. Google itself has that following. You think Google cannot store that history even if you don't have location services off? The record shows that that's what they do. That's how their system focuses. I understand how this works. And that's correct in terms of how this happens. This information here is seeking that information. But Google is conducting the search, and I'm only dealing with what Google can do. And in that context, we just talk about Google. Google, yes, that's the front tier. It's easy. Give you that. You've got location services. What I'm asking is, does Google not have, or do you know, or do we know, or do we have an obligation to determine that it can also store this information even if you don't have that service on? The testimony in the record from Google's location history product manager is that location history is the only information that Google stores, which is sufficiently granular to place someone in the described geofence. And so that's what Google's testimony is, that that's what they have. I want to make sure it's the only one it stores. That was my question. I said, did it have the technological ability to get information that does not have that service on? That's the question, and you didn't ask that question to them. So you see where I'm going with this? I mean, Google's conducting the search. They're the one telling it. So they're telling you this is only services with the phone number. What we don't know is do you have the ability to get information that's not just with location services on? We don't know. So I don't think that Google is performing the search here. I think the search here, as the Supreme Court says in Carpenter, is when the government accesses information from a service provider. I think that what is done by Google in sort of internal – The government gets a warrant and says, Google, give us the data, and Google says, okay, here, here's a portal. Go get that data. I thought Google provided the data information as to what the search is for. I think the search occurs when the government accesses information given by the provider. It has nothing. It does not access anything. It's accessed the ability to get Google to give that information to them. In this case where the government accessed was one hour of location information concerning 19 people who were within a radius of 150 meters of the bank at the time of the robbery. For nine of those people, we obtained a full two hours of their location information. And for three people – What actual information is turned over by Google to law enforcement pursuant to a geofence warrant? It's served on Google. What information is turned over in these cases? It's just purely locational data. So, Your Honor, in this case, the information is so specific that you can see every bit of information we got from Google in about 30 pages of the record. I think it starts at Joint Appendix 2098. And it will basically be a line, and each one will have a time and date associated – Is there information as to friends and associates or other private aspects of the individual's life or who they may be dating or what text messaging and who they're texting? Absolutely not. In other words, we're not doing a deep dive into someone's personal effects and into somebody's private affairs. Are you representing that all that's turned over is locational data? That's right, Your Honor. It's latitude and longitude information. And Google has an estimate of how accurate it is for any particular point, whether it comes from how they calculated it. Why is that locational data helpful to you if it's as limited as you suggest? Well, in this case, it's sufficiently accurate to put the robber in the vicinity of the bank and sufficiently accurate to see where he parked near the bank and to follow him to and from. Just looking at that one hour of location information within 150 meters of robbery was a lot like videotape. And so knowing where the robber parked, we could see whose device it was, and that was enough. So it was essential to you in resolving this crime? Oh, absolutely. This is an enormously useful technique. Without the locational data, the bank robber would still be at large? Very likely, Your Honor. Which step are you talking about? You just answered Judge Wilkerson's question in sort of a very cabin way. What did you get? Aren't there three steps here? So what I described as the first step, but the first step was enough for us to look at it. The first step was one hour of location information. Was the first step just 19 people? Just 19 people. So when you got the data you got, the data that you asked Google to search was just 19 people? Specifically 19 people, and that's all it searched? I don't, so I think the search comes when the government reviews information. We learn nothing in Google about anything else about anyone in Google's database. We don't know who has a Google account, who doesn't have a Google account. And the real search occurs when the government reviews the data. And, you know, as in this case, it is true that Google has You're using that term like specifically, right? So there might colloquially have been a search that was done by Google. But the Fourth Amendment search is what Carpenter and Beautiful Struggle say is when the government accesses the data. That's right, Your Honor. And so while there might be, I just, I wonder if there's like a miscommunication about the term. Colloquially, there might be searching that's taking place. But for the Fourth Amendment, the search that matters is only those 19 individuals. Like that's the Fourth Amendment search. Yes, Your Honor. And otherwise it would, you know, I think internal provider practices, which aren't in any way visible to the government or to But the warrant itself does not identify individuals or suspects, does it? No, it doesn't, Your Honor. What does it do? That's just the data. We keep jumping forward to what you actually get from it. But the data that Google then produces and using location history, how many folks, where does this number 592 million come from? What does that mean? That's not in the record, so I don't know where counsel got that from. There is a What are they talking about? You have an idea? I suspect that's like a total number of Google customers or something. But the number which is in the record is Google has tens of millions, it says tens of millions of people or something along the lines. What's the tens of millions? How does that compare with 19 when you first got this warrant? Typically you got a warrant, you can name a number of people, you know who it is. Somehow we've now moved as though that warrant asked for 19 things and you went after those 19. That's not what happened here, is it? Your Honor. When you started out, you didn't have a name, you didn't have a suspect, you wanted some data. And then you get this number tens of millions. Who's the tens of millions? Those are people who I guess have Google accounts as information we never got. Are they included in this data that Google is going to be looking at? Google did not produce any information about anyone except the 19. To me, the warrant really has an enormous amount in common with the warrant the Supreme Court approved in Zurcher v. Stanford Daily. There had been a riot in which police officers were assaulted and law enforcement had information that someone had taken, newspaper people had taken photographs of the crime scene. The Supreme Court held that a warrant for those photographs complied with the Fourth Amendment. There were no specific individuals known or named in that warrant. It was that the newspaper had crime scene evidence. What was the request for? Was the request for 19 individuals? The initial warrant, what did it request? It requested location information for people who Google could place within 150 meters of the bank during the hour of the robbery. There is no 19 in that? There is no 19 in that. That comes later. Basically, you can go out and search everybody. You can do a Knoxon search on everybody out here. You request that, and then when we find 19, we're going to then say Fourth Amendment right as to the 19. I think it's like Google's crime scene photographs, basically. Or it's similar also to every time we do a bank account warrant. You do it by the bank account number, and so the bank has to go look through its list of numbers to find the bank account number. We don't identify the person. We just give them a number. That's what all warrants for third-party data do. They ask for a specific piece of that information, and that's what the court tells us. The search is the information that is given to the government. That's right. A bank account number is not a location history, is it? I'm sorry? A bank account number is not a location history, is it? No, it's not. It's a set of numbers, right? It's just a number. That's all it is, and you've given it to a bank, and so you kind of know it's in bank. You've got an account in that bank, and you've got that number. We're not talking about that here. We're talking about a megachurch that's down the road. We're talking about this court. We're talking everybody walking out here. Those are the tens of millions. You're talking rich, but you're talking about right here. That's the initial information that's being provided by the office. He didn't ask for 19. He doesn't even know it's 19. I'm pretty sure. He doesn't know anything. So he's now gathering information, but to do it, you've got to do this sweep. It's not a bank account number. It's the people who are in a particular area, and I think in the information that they're looking for, I think the people within 150 meters of the bank really is appropriately linked to this crime because it's going to let them determine who the perpetrators are. It's going to let them determine co-conspirators. There is reason to believe that Mr. Chaffee might be working with others. His ransom notes said his boys were outside on the lookout. Do this for a high-crime area because it sounds like to me if you classify an area as a high-crime area, why not just do a G01 sweep and check out what people are doing in there, and then once you get it, identify people and proceed. This case has a specific serious crime in a location which is appropriately compared to that crime. High-crime area. You've got a couple of murders that happened over there. That's a specific serious crime. Every time a murder happens there, you're going to do a geofence warrant on everybody. Is that right? Is that okay? If you have a murder happen and there's reason to believe that Google has… So what does the crime have to be? Does it have to be a murder? Does it have to be a bank robber? Does it have to be a felon? I mean, this is a warrant. You need a crime and you need the probable cause standard is a fair probability. There's no evidence that this parade of horrors and thorough scrummaging and searching through every aspect of an individual's life, there's no evidence that that's taken place. Not at all, Your Honor. Like I say, all this information… We've got a patient dealing with a high-crime area. All this information is… I'm saying high-crime area. If you want a geofencing area, you do a high-crime area. If you want to find stuff, you don't need to be downtown Richmond. You don't need to go into other neighborhoods. If a crime occurs in a so-called high-crime area, can you use a geofence warrant to just check everybody's stuff out in the whole area? I mean, the issue for any warrant is whether there's probable cause in particularity. You would need reason to believe that Google has evidence of a crime. What's the difference here in a high-crime area? Let's say you've got a whole neighborhood and it's classified as high-crime. Here, you've got a bank and you've got a robber and you see someone on a cell phone. What's the difference of someone in a high-crime area using a cell phone near somewhere that there was a murder or there was some other heinous type offense? No difference? In those instances, I'm only asking because if that's the result, that's the result. It may well fit the same pattern that Judge Wilkerson has alluded to here, but I want to know that is that going to be the standard that when those crimes occur in those areas, a geofence warrant is going to happen? I mean, I think if you have a murder occur and there's reason to believe that the murderer had a cell phone, then it's very likely you could get a geofence appropriately tailored to the particular location of that murder. Any other crime in which you know someone has a cell phone, geofence warrant? This is definitely solving a lot of very serious crimes, yes, Your Honor. Great. I understand. I just want to know the scope of it. And I want to know, I mean, if it happens in that megachurch and someone goes in there and has a crime, you can do one in the church, you can do it all around the whole thing. Yeah, maybe if the church is in Charleston, you could put it around it. You can use a geofence warrant, and the only indication is you got a cell phone and a crime occurred. Is that it? I mean, you need a fair probability that there would be evidence of a crime in order to get a search warrant. I want to be clear. That is an issue. I mean, you know, and certainly… The law dispenses about four for amendment we're discussing. You don't need but two facts. You need a fact of a crime and a cell phone. You know, there are other similar circumstances with modern technology. These days, lots of people have ring doorbell systems which videotape what's going on the street in front of their house. If you know that there was a robbery that was caught on that, then, you know, that's pretty much sufficient to get probable cause to get the scene of that crime as well. So, yes. All right. So… Can you give me a picture of the legal landscape on this? Notice your brief says that a large number of courts have approved geofence warrants. Is that correct? Absolutely, Your Honor. I mean, Google says it gets like $10,000 a year. I mean, are they circuit courts, district courts? I mean, this is talking about people signing off on issuing the warrants. So, I would say a very large number of… The question was any of them circuit courts? No other circuit courts except… Any of them Supreme Court cases? No Supreme Court cases, but I want to go back to the circuit court question. I'm talking district courts or magistrate type things. So, there's a one circuit court of opinion, court appeals opinion of note, which is the James case at the 8th Circuit. The question here is the… One question here I have is to the applicability of Leon. When the Leon Doctrine was first announced, it was to protect the good faith of officers who observed the warrant process rather than trying to circumvent it with the warrant exception. And I think over time that Leon has taken on a second function, which is to invite incrementalism, and that is rather than charging in with a ruling that sweeps too broadly. We indicate that it was… You know, this was a good faith application of the warrant clause and good faith affidavit and the rest. Is this an appropriate case for Leon and can we preserve the values of incrementalism by not actually ruling on the merits of the geofence warrant? I'm not sure how I feel about the question. I'm just asking you whether an application of Leon… We're always worried about the future and say you don't want tomorrow to embarrass you. You don't want to be embarrassed about tomorrow. And maybe the answer is the district court rested on Leon grounds and maybe Leon has an applicability here. And I don't understand Leon to say that we have to rule or give some up or down verdict on geofence warrants. The Supreme Court in Pearson v. Callahan has preserved the flexibility of courts of appeals to go for narrow grounds like qualified immunity without ruling on the merits of the underlying question. And this is an area where it can't be presumed that judges are experts. And sometimes when you have technological questions with wide implications, sometimes it's better to just get your toe wet rather than taking a plunge. So I'm wondering how you feel about Leon in these kind of circumstances and whether this is a proper case for the application of it. Certainly it is entirely appropriate for this court to resolve this case solely on the good faith exception. This is a case with a new investigative technique. Is that simply a fallback argument on your part? Is it something you actively embrace or what? I leave that to discretion of this court. You've embraced three arguments. Yes, I stand with all our arguments, but certainly this court has discretion to simply resolve it based on good faith. And here there was no contrary case law. I hope that I'm interpreting my friend and colleague Judge Richardson correctly, but the arguments are that there's a problem here with standing initially when there's a voluntary provision of things to the third party. And the other argument is does this geofence warrant stand or fall on the merits? And the third is Leon. And Leon, if we were to reverse this outright and say, did Officer Hilton even lack good faith in filing the affidavit and in seeking to serve Google with a geofence warrant, that's putting an awful lot of burden on officers to be able to know and forecast the legal landscape. I mean, here this officer had the Carpenter decision. I guess he maybe had some familiarity with that, maybe not, but he knows the difference between seven days and two months. And he knows that there's Smith and Miller and they haven't been overruled, or he's not going to assume that they're overruled when someone voluntarily provides information to a third party, which then turns it over to the government. And then we have the three of us here, whom you might surmise do not see the legal question in precisely the same way. And yet we are going to put the burden on Officer Hilton to unravel legal questions with which we ourselves have legitimate difficulties. And the question is, have we transformed police officers and FBI agents from laymen into lawyers? Are they supposed to be able to have some sort of divining rod that allows them to discern what the Supreme Court and a large body of federal courts do not? I mean, that's a problem there, isn't there? Absolutely, Your Honor. That's one of the factors that courts have looked to in applying good faith because it is disagreement on a legal issue among the judiciary is a strong indication that you can't expect the officer to... How are we going to help them if we just say good faith here and don't address the merits? I mean, the Kelly and Pearson case created that same conundrum in Section 1983. You go look at it and see if it's... On the second prong, you don't even get to the constitutional violation prong. And the same thing is being suggested here. Let's just decide it on good faith. Well, if you keep the officer ignorant on the law by not telling them the first question, good faith is going to last forever. And everything that comes up is going to be good faith, good faith. And while Officer Hilton, all due respect to him, there are training sessions. Didn't ask for it. There are opportunities to understand these ones, to get different information from Google to educate themselves on how these ones work. You know what you do if you hold good faith? You don't incentivize anybody to do anything. If I was running a police department, I wouldn't run a training program or anything on it. I'd keep them just as ignorant as I could because then the answer will always come back, well, what is he to do? He doesn't know this stuff as though he's living in a vacuum. And yet it's the rights of the citizens that's important here. The focus is not on law enforcement. It is on the rights of citizens guaranteed by the Constitution of this country. And when we focus there, as opposed to worrying about how you catch people, as I said, you could use Nazi techniques and you can have the best police state in the world and you probably would reduce crime significantly. But we don't live in that kind of world. So while the good faith exception could be the way the district court did it, if it went in that direction, it might be proper. It actually decided the constitutional issue says this is unconstitutional. Then it went to good faith. I could probably live with that. That makes sense. You've told the answer here. But to just say presume or we don't have enough understanding and therefore we're going to be like you and all of us will not ever understand so you have good faith, keep doing it. That doesn't seem to follow. It has been a good way to handle matters that deal with constitutional rights of ordinary citizens. Of course, time itself provides experience and time itself provides further information and time itself provides an accumulation of court decisions and evidence as to how the geofence warrants are used in commentary and debate. In other words, courts can derive advantages from modesty and the passage of time. When we read the Fourth Amendment, it's important not to overlook the word that the framers put in there, unreasonable searches and seizures. The word reason is in there and reason suggests a certain compromise. It doesn't suggest absolutism. It suggests balance, suggests compromise, which is the kind of thing we're trying to thread through when we have significant privacy interest on the one hand but also very grave security interest in the protection of public safety and the lives of citizens on the other. There's nothing wrong with an approach that gets their toe in the water rather than taking the deep plunge. That's just one of the three reasons why a reversal here might not be the optimal course. There's the standing issue that my colleague has identified, the merits questions and the plain differentiation from Carpenter is another reason. The Leon Doctrine is the third reason. But you understand the obstacles to just saying, these geofence warrants are total invasions of privacy. That's a very consequential step, isn't it? Absolutely, Your Honor. These are solving enormous numbers of very serious crimes. Look at the evidence in the record of what we actually get from them. It's remarkably particularized. It's essentially like another form of crime scene video evidence. It's very close to that. We're getting them with warrants supported by probable cause and specifying the data to be seized with particularity. We think it complies with the Fourth Amendment. We are just court to affirm. Are you sure? I'm sure. You're terrific. Let's hear from you in rebuttal, sir. I'll try my best not to interrupt you. I really owe you an apology because you're making a good argument and I shouldn't be interrupting you all over the place. Go ahead. Thank you, Your Honors. I want to just start off, I think, where we sort of ended, talking about good faith. Note that this is not a one-off situation. This is not Detective Hilton's first geofence warrant. In fact, the previous three looked remarkably similar in that they basically had the same terms and were also devoid of any facts relating to those crimes at hand. It is, I think, also important to point out that those same warrants also left out very important information about how these geofence works, how many people get searched, and the nature of that search and seizure. And I think that is also part of a larger practice here. This court is familiar, at least from the Andrews case, with the use of new technology and the tendency for law enforcement to be less than forthcoming with courts about what's actually going on here. And that three-step process, which the government now sort of disclaims, speaks to that. To that tendency to omit information that is relevant to the determination of probable cause in particularity. And for that reason, I do think deterrence here is warranted. Second, I want to go back to this point about opting in. The screens there told Mr. Chaudhry that it's going to create a private map and save where he goes. There was no information in there about it saving his location history 240 times a day, even when he's asleep or in the shower. There was nothing in there to say that the data won't go away if you turn it off. The consent flow, what we're talking about here as evidence of voluntarily participating in this, is extraordinarily weak. And the evidence that is there seems to indicate to a normal user that this is going to be private. Google, in fact, does not share this information with advertisers in terms of individualized data. Google creates advertising, but advertisers never see individual location history data. And that is not something that Google ever creates. In fact, Google did not have a ready-made list of people within 150 meters of the bank when the government came asking. They had to create that data. They had to search their records and create it. It wasn't just asking for a file that they have in the file cabinet. I think it's also important to talk about the discretion here in steps two and three. We've focused a lot on step one. But the district court here was very clear that the warrant gave police unbridled discretion to search those 19 people at will, to decide which of them to go get more information about, see where they came from, see where they went to, to deanonymize them at the end of this process. All of that was left explicitly up to the police, and that is a textbook example of an unparticularized warrant. The technology may be new here, but the Fourth Amendment requires particularity. And as in GROW, any officer who relies on a warrant that plainly violates that commandment should not receive the benefit of good faith. Finally, we're talking about the length of time. And I want to go back to the leaders case because I feel like that is fairly analogous in some ways in terms of the time here. Leaders involved 45 days of aerial surveillance, but the snippets that law enforcement received when there was a crime that occurred were a matter of a few hours, about the same amount of time we're talking about here. And what the court found significant in leaders was this idea that the police can go back to this repository of data that is always there, giving them a previously unknown power as if they had a time machine or could go back and track everybody retroactively. So it's that ability to go back and remove the relevant snippet of time that was concerning to the court and leaders, and I think the same sort of analysis applies here. Thank you very much, Counsel. Thank you, Your Honor.
judges: J. Harvie Wilkinson III, James Andrew Wynn, Julius N. Richardson